# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3234 | **DATE** | 7/3/2001 |
| **CASE TITLE** | Edward P. Alexander et al vs. Phoenix Bond & Indemnity et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: We grant in part and deny in part defendants' motions for summary judgment. Motions [209-1], [229-1], [228-1] are granted. Judgment is entered in favor of D.S. Tax, Oak Park Investments and C.B.B.B., Inc. Motions [242-1], [231-1], [235-1], [238-1], [224-1], [226-1], [233-1] are denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| ✓ | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUL 0 6 2001 |
| | Docketing to mail notices. | date docketed |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | date mailed notice |
| TSA | courtroom deputy's initials | |

FD-7
FILED FOR DOCKETING
01 JUL -5 PM 5: 14

Date/time received in central Clerk's Office

mailing deputy initials

**Document Number**

284

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JUL 0 6 2001

| | | |
|---|---|---|
| EDWARD P. ALEXANDER and | ) | |
| MARILYN M. ALEXANDER, on behalf of | ) | |
| themselves and other similarly situated individuals, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 98 C 3234 |
| v. | ) | |
| | ) | District Judge Wayne R. Andersen |
| PHOENIX BOND & INDEMNITY COMPANY, | ) | |
| NATIONAL INDEMNITY CORPORATION, | ) | |
| MIDWEST REAL ESTATE INVESTMENT | ) | |
| COMPANY, MILFORD ARDELL, ALLEN | ) | |
| KAPLAN and FRED SHANDLING, individually | ) | |
| and d/b/a REGENT PROPERTIES, REGENT | ) | |
| PROPERTIES, CAPITAL ASSET RESEARCH | ) | |
| CORPORATION, LTD., OAK PARK | ) | |
| INVESTMENTS, INC., BARRETT ROCHMAN, | ) | |
| individually and d/b/a S.I. SECURITIES, | ) | |
| S.I. SECURITIES, INC., FIRST FINANCIAL | ) | |
| FUNDING CO., DAVID GRAY and BONNIE | ) | |
| GRAY d/b/a PARTNERS, C.B.B.B., INC., | ) | |
| D.S. TAX ASSOCIATES, LTD., NOBLE TAX | ) | |
| INVESTORS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on a collective motion for summary judgment filed by all

remaining defendants and individual motions for summary judgment. In this case, plaintiffs allege

violations of the Sherman Act and the Illinois Antitrust Act. Plaintiffs allege that defendants

conspired to fix the bidding rate at the 1996 Annual Cook County Property Tax Sale. In support of

their allegations, plaintiffs highlight the fact that the average winning bid rate at the 1996 Tax Sale

284

was 15.71%, compared to the average rates of 2.1% and 3.11% for the two previous years. For the following reasons, defendants' motions for summary judgment are granted in part and denied in part.

**BACKGROUND**

I.     General Tax Sale Background

The Cook County Collector has a variety of procedures to obtain payment of delinquent property taxes. Phoenix Bond and Indemnity et al v. Pappas, 2000 Ill. App. Lexis 35, * 1 (Illinois Appellate Court 1st Dist. 2000). The Collector will generally proceed in rem and file, in the Circuit Court of Cook County, for a judgment in the amount of taxes due plus costs and obtain a court order authorizing sale in satisfaction of the judgment. Id. If the Circuit Court grants approval, the delinquent taxes go to public auction. Pursuant to the Illinois Property Tax Code, the Collector publishes a list of parcels for which property taxes are delinquent. The Collector also publishes notice of its intention to apply for a judgment and order of sale of the tax delinquent properties. 35 ILCS 200/21-110 (West 2001). The delinquent properties are then sold at the Cook County Annual Tax Sale.

The 1996 Annual Tax Sale, held from January to March of 1998, is the subject of the instant lawsuit. At the sale, properties for which 1996 taxes were delinquent were presented through a descending open outcry auction. Tax buyers, the defendants, bid a penalty rate that delinquent tax payers must pay in order to redeem the property. Under Illinois statute, bidders are allowed to bid penalty rates that range between 18% and 0%. 35 ILCS 200/21-215 (West 2001). A delinquent tax payer may redeem the parcel within two years of purchase by the tax buyer. The tax payer must pay the judgment, interest, the tax buyer's costs, and the penalty which accrues at six month intervals at the rate bid during the auction. Three to five months before the expiration of the redemption period,

2

the tax buyer may file for a tax deed. The tax deed will be granted if the property is not redeemed during the statutory period. The tax deed gives the tax buyer ownership of the land in fee simple, subject to certain easements and covenants. 35 ILCS 200/22-70 (West 2001).

Under the rules of the auction, the auctioneer will not seek a lower bid. The bidding is descending, which means that the bidding starts with the highest penalty rate and then makes its way downward. Buyers shout out penalty rates. The buyer to shout the lowest rate is granted the property. If tie bids are shouted simultaneously and no lower bid is submitted, the auctioneer will select the winning bidder in a manner so that no particular bidder obtains a disproportionate share of the properties available.

If no bid is made on a property, that property is forfeited. There are several options for the Collector after a forfeit, but the only one that concerns this lawsuit is that tax buyers may redeem the forfeited property from the County and receive a statutorily set 12% penalty rate.

In order to participate in the Cook County Annual Tax Sale, prospective bidders must file an irrevocable letter of credit or bond at least ten days prior to participating in the auction. 35 ILCS 200/21-220 (West 2001). The amount of the letter of credit must be 1.5 times the value of the total tax due on any and all properties purchased. Id. It is the responsibility of the tax buyer to maintain credit in the amount of 1.5 times the value of any unpaid portion of tax, from which the Collector can draw in the event payment is not made forthwith by the tax buyer. Id.

A new auction participant emerged in the 1992 Annual Tax Sale, held in 1994, and changed the dynamic of the tax sale. One of the defendants, Capital Asset Research Corporation, joined the Cook County sale for the first time. Its goal was to garner as many tax certificates as it could. Capital Asset registered multiple bidders for the sale. Registering multiple bidders is a strategy

employed to garner more than a pro rata share of the taxes because, if the bids are tied, then the auctioneer attempts to divide equally the properties between the registered bidders. If one corporation has several bidders present, then each of those bidders will receive a share of the divided properties. Capital Asset also employed a strategy of bidding the properties down, which led to much lower penalty rates at auction.

Capital Asset's success led other tax buyers to follow suit and register multiple bidders. This led to even lower average winning rates. Defendants' expert has calculated the average winning bid rates from 1984 through 1996. Plaintiffs's expert calculated the distribution of winning bids, but only calculated those figures for the period between 1989 and 1996. We first list the most common bid followed by the percent of all properties in which that penalty rate was the winning bid.

| YEAR | Properties Sold | Average Winning Bid Rate | Most Common Winning Bid |
|------|-----------------|--------------------------|--------------------------|
| 1984 | 17, 099 | 11.23% | |
| 1985 | 17,853 | 8.48% | |
| 1986 | 20,008 | 9.95% | |
| 1987 | 20,084 | 10.43% | |
| 1988 | 19,186 | 12.51% | |
| 1989 | 23,140 | 12.14% | 18% (41.73%) |
| 1990 | 22,500 | 11.14% | 18% (41.51%) |
| 1991 | 27,442 | 8.20% | 18% (28.40%) |
| 1992 | 21,852 | 4.12% | 0% (54.01%) |
| 1993 | 22,044 | 3.98% | 0% (58.65%) |
| 1994 | 24,797 | 3.11% | 0% (73.03%) |
| 1995 | 26,159 | 2.10% | 0% (79.73%) |
| 1996 | 28,287 | 15.71% | 18% (78.19%) |

II.   Plaintiffs' Timeline for the 1996 Annual Tax Sale

Plaintiffs argue that defendants had multiple opportunities to conspire before the beginning of the 1996 Tax Sale. Most of the defendants had principals and agents researching properties in records maintained in the Cook County Clerk's office on the 4th floor of the County Building at the same time. Many deponents testified that they would see and converse with employees or agents of other tax buyers. Furthermore, several defendants had formerly worked for or with other defendants. For example, Alexander, employed by National Indemnity Corporation, had formerly been employed by Phoenix Bond. Kovacevic, employed by Phoenix Bond, had bid for Midwest at previous sales.

The principals of many of the defendants also had various connections. Many defendants participated in trade organizations. Furthermore, some of the defendants were friends. However, plaintiffs have failed to provide any evidence which suggests that the social activities were involved in this alleged conspiracy, but they argue that the social activities serve as evidence that defendants had the opportunity to conspire.

On January 6, 1998, Ardell and Kaplan, of Regent, and Michael Nadler, Capital Assets' National Risk Manager, had lunch. Plaintiffs allege, without direct evidence, that the parties agreed to forego the use of multiple bidders at this meeting. Ardell and Kaplan testified that they discussed issues unrelated to the upcoming Cook County Tax Sale.

On January 9, 1998, Berland of National informed Cruz, National's lead bidder, that she would be National's only bidder. On January 2, 1998, National had registered 21 bidders for the Tax Sale.

The 1996 Annual Tax Sale began on January 12, 1998. On the first property offered for sale at the Tax Sale plaintiffs allege that Regent, Midwest, Phoenix Bond and First Financial

simultaneously entered identical bids for 18%. First Financial, Phoenix Bond and Regent deny that they bid on the first item offered for sale.

Most defendants registered multiple bidders for the Tax Sale, but only Q.T.S. (An original defendant which has settled with the plaintiffs) and Regent actually sat their multiple bidders in the bidding area. Only Q.T.S. actually used its multiple bidders to bid on properties. Defendants allege that three others, Midwest, Phoenix Bond and Capital Asset, brought multiple bidders, but had them wait in another room, uninvolved, at the beginning of the sale.

Q.T.S., through its multiple bidders, won a large share of the initial properties. After one of the multiple bidders won an item, Cheryl Prosen, Q.T.S.'s lead bidder, had a conversation with Andrew Marks. Marks asked Prosen why she was using multiple bidders. Prosen responded that she could bring as many bidders as she wanted to the Tax Sale. Marks responded by stating: "[w]ell, we can bring as many bidders as we want to a sale, too, and if you keep them here, we will." The parties disagree about the appropriate interpretation of Marks' statement. Plaintiffs argue that Marks was referring to the conspiracy, but defendants argue he was merely referring to the family business. Plaintiffs further argue that the conversation is proof of the conspiracy policing its members because Q.T.S., after the conversation, sent away its multiple bidders.

The 1996 Sale, like all Cook County Tax Sales, began with properties located in Barrington. Thirty-three out of the first thirty-six properties sold at 18%. From January 12 to January 20, 1998, 95% of the properties were bought by a simultaneous bid of 18%. On January 21, the auctioneer made this statement:

> As you are all aware the statute provides that during this sale the property in question shall be awarded to the bidder who bids the least penalty percentage. In accordance with the statute, the following procedure will be implemented.

7

> Only the person offering to pay the amount due on each property for the least penalty percentage will be the successful purchaser of that property.
>
> No bid shall exceed 18% and if multiple simultaneous bids of the same percentage are made, no one of these bids being the least, none will be accepted.
>
> If multiple simultaneous bids are received at the same percentage, bidders will be given an opportunity to bid at a lower percentage and if no bid of a lower percentage is received, the property will be forfeited.

The Tax Collector instituted the rule in order to guarantee and promote competitiveness. The imposition of the forfeiture rule led to lower bids. Furthermore, after the forfeiture rule was instituted, only four properties were forfeited due to multiple simultaneous bids. On the second day of the forfeiture rule, January 22, 1998, three items in a row and one later received only simultaneous bids at 18%. These items were forfeited despite the fact that the auctioneer gave the group the opportunity to go lower. The next day, Cruz of National bought the four items "over the counter". Therefore, she received a penalty rate of 12% for those four properties.

Phoenix Bond, Midwest, Oak Park and S.I. brought an action for a temporary restraining order and a permanent injunction in the Circuit Court of Cook County. The four forfeited items formed the basis for their complaint. On January 27, 1998, the plaintiffs obtained a temporary restraining order blocking enforcement of the forfeiture rule. Immediately thereafter, tax buyers resumed making simultaneous 18% bids. A string of nearly 500 items in a row were bought at 18%.

Plaintiffs submitted several sets of numbers comparing the 1996 Tax Sale to the 1995 Tax Sale. At the 1996 Annual Tax Sale, 78.19% of properties sold for 18% penalty rate. At the 1995 Sale, 79.73% of the properties sold for 0% penalty rate. At the 1995 Sale, there were only three runs of 10 or more items in a row sold at 18%. At the 1996 Sale there were 426 such runs.

III.     Procedural Background

      A.     State Case

Maria Pappas, the Cook County Treasurer and ex-officio County Collector of Cook County, appealed the Circuit Court decision granting the TRO and summary judgment in favor of the tax buyers. The Illinois Appellate Court reversed the Circuit Court and ordered entry of summary judgment in favor of the County Collector. Phoenix Bond and Indemnity Co. et al v. Pappas, 2000 Ill. App. Lexis 35, *21 (1st Dist. 2000). The tax buyers appealed that decision to the Illinois Supreme Court. The Illinois Supreme Court affirmed the Illinois Appellate Court, finding that the County Collector had the authority to institute the forfeiture rule. Phoenix Bond & Indemnity Co., et al v. Pappas, 2000 Ill. Lexis 1715, *9 (2000).

      B.     Federal Case

Alexander, on behalf of himself and similarly situated plaintiffs, filed his First Amended three-Count Complaint before this court on July 22, 1998. In Count I, he alleged a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and sought treble damages under Section 15 of the Clayton Act, 15 U.S.C. § 15. In Count II, he alleged a violation of Section 10/3(1) of the Illinois Antitrust Act, 740 ILCS 10/3(1)(West 2001). In Count III, he alleged a violation of Section 10/3(2) of the Illinois Antitrust Act, 740 ILCS 10/3(2)(West 2001). As a remedy for the violations alleged in Counts II and III, he sought treble damages under Section 7 of the Illinois Antitrust Act, 740 ILCS 10/7 (West 2001).

On September 30, 1999, we granted plaintiffs' motion for class certification in part and certified a class consisting of all property owners or other persons responsible for payment of real

estate taxes for property located in Cook County, Illinois whose taxes for the tax year 1996 were sold by the Cook County Treasurer at the 1996 Annual Tax Sale for a penalty rate greater than 0%.

## DISCUSSION

Summary judgment is appropriate when the pleadings and supplemental material present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). To survive a defendant's motion for summary judgment, a plaintiff must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). Because this case comes to us on defendants' motions for summary judgment, "[t]he evidence of [respondents] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The parties dispute what standard we should apply to a summary judgment on an antitrust case. Plaintiffs reference an old standard disfavoring the use of summary judgment for antitrust claims. Plaintiffs note the that the Supreme Court has stated that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot . . . Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice'" Poller v. Columbia Broadcasting System, Inc. et al, 368 U.S. 464, 473 (1962).

However, in two later cases the Supreme Court clarified the process and lowered the standard for reaching summary judgment. In order for an antitrust case under Section 1 of the Sherman Act to reach a factfinder, "there must be evidence that tends to exclude the possibility of independent

action by the [defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 763 (1984). The antitrust standard articulated in Monsanto was clarified in Matsushita, plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." Matsushita, 475 U.S. at 588.

These cases have been analyzed by several courts. The courts have engaged in a two part inquiry: "(1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests." Gibson v. Greater Park City Co., 818 F.2d 722, 724 (10th Cir. 1987); Market Force Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1171 (7th Cir. 1990). The Seventh Circuit has reconciled Poller with Matsushita and Monsanto by stating that "in complex antitrust cases, summary judgment should be used sparingly, unless the record is clear that the antitrust claims cannot succeed." Wigod v. Chicago Mercantile Exchange, 981 F.2d 1510, 1514 (7th Cir. 1992)(Cites to Poller). Later Seventh Circuit case law clearly recognizes, even if in dicta, that Matsushita repudiated the notion that summary judgment is disfavored in antitrust cases. Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).

Plaintiffs claim, based on their reading of the Supreme Court case Eastman Kodak Co. v. Image Technical Services, Inc., that the two part test derived from a reading of Matsushita and Monsanto is inapplicable in this case. Kodak, 504 U.S. 451 (1992). Plaintiffs argue that Kodak

11

limits <u>Matsushita</u> to alleged conspiracies which do not make economic sense. <u>Id</u>. at 467. We agree, in part, with plaintiffs' analysis. <u>Kodak</u> explicitly states that "[t]he Court's requirement in <u>Matsushita</u> that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. <u>Matsushita</u> demands only that the nonmoving party's inferences be reasonable in order to reach the jury." <u>Id</u>. at 468.

In our reading of <u>Kodak</u>, it stands for the proposition that a conspiracy that does not make economic sense should be dismissed because "no reasonable jury could find in its favor", not that summary judgment should not be granted on an alleged conspiracy that does make economic sense. <u>Id</u>. at 469.

The two part test above is the way to approach evidence on an antitrust case and is very similar to the burden shifting propositions found in many other areas of law. <u>See</u> <u>generally</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)(Employment discrimination). This standard has been applied to alleged conspiracies that make economic sense after <u>Kodak</u>. For example, "[w]hen circumstantial evidence is used, there must be some evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." <u>Toys "R" Us, Inc., v. Federal Trade Commission</u>, 221 F.3d 928, 934 (7th Cir. 2000)(Citing <u>Monsanto</u> and <u>Matsushita</u> in a conspiracy that makes economic sense.); <u>See also</u> <u>In re Brand Name Prescription Drugs Antitrust Litigation</u>, 186 F.3d 781, 785 (7th Cir. 1999), <u>cert</u>. <u>denied HJB, Inc. v. AmeriSource Corp.</u>, 528 U.S. 1181 (2000); <u>Serfecz v. Jewel Food Stores, et al</u>, 67 F.3d 591, 599 (7th cir. 1995). Therefore, as in all summary judgment cases, we will find all reasonable and justifiable inferences in the non-

movants' favor. However, an inference of conspiracy in a case based on circumstantial evidence is only justifiable if there is some evidence which tends to exclude independent action. This is not a special burden. Plaintiffs do not have to exclude all possibility that the defendants acted independently because "that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred." Toys "R" Us, 221 F.3d at 935. Therefore, we find that the standard to be applied is neither as burdensome as the defendants suggest, nor as lax as the plaintiffs suggest. When confronted with evidence that shows a non-conspiracy explanation for defendants' behavior, plaintiffs must come forward with evidence which is reasonably subject to an interpretation which accounts for defendants' arguments. Put more simply, plaintiffs evidence must reasonably show that defendants engaged in a conspiracy, but is not expected to disprove all other possible inferences. This is why the Supreme Court stated that plaintiff must present evidence that "tends" to exclude other possibilities and has not required plaintiffs to present evidence which does exclude *all* other possibilities. Matsushita, 475 U.S. at 588.

Some courts have applied plaintiffs' standard in cases in which plaintiffs were able to marshal some direct evidence of a conspiracy, but that is not the case here. In re Coordinated Pretrial Proceedings in the Petroleum Products Antitrust Litigation, 906 F.2d 432, 441 (9th Cir. 1990). In that decision, the 9th Circuit emphasized the importance of not upsetting the traditional balance of a summary judgment proceeding. Id. at 438. Even though the 9th Circuit has upheld the use of the traditional summary judgment standard in an antitrust case, if the plaintiff has direct evidence of conspiracy, it later repudiated the Petroleum Products standard as applied to circumstantial cases, finding that it was dicta. In re Citric Acid Litigation, 191 F.3d 1090, 1096-97 (9th Cir. 1999). Therefore, we continue to apply the standard that the plaintiff, in addition to ambiguous

circumstantial evidence of conspiracy, must come forward with evidence that reasonably tends to exclude the possibility of independent action.

     I.     <u>Substantive Conspiracy Allegations</u>

In order to recover under Section 1 of the Sherman Antitrust Act, a plaintiff must prove: 1) a contract, combination, or conspiracy; 2) a resultant unreasonable restraint of trade in the relevant market; and 3) an accompanying injury. <u>Denny's Marina, Inc. v. Renfro Productions, Inc.</u>, 8 F.3d 1217, 1220 (7th Cir. 1993). Defendants argue that plaintiffs, through their introduction of circumstantial evidence, cannot show anything more than the fact that defendants engaged in parallel pricing behavior.

Several Courts have developed standards for determining whether conscious parallelism is evidence of a conspiracy. The theory of conscious parallelism is that uniform conduct of pricing by competitors permits a court to infer the existence of a conspiracy between those competitors. <u>In re Baby Food Antitrust Litigation</u>, 166 F.3d 112, 121 (3rd Cir. 1999). Conscious parallelism is generally a theory applied to highly concentrated markets where few sellers exist and where they establish their prices, not by express agreement, but rather in a consciously parallel fashion. <u>Id</u>.

Plaintiffs have submitted testimony showing that the mechanics of the Tax Sale, including the descending open outcry bidding process, small number of bidders, ability to immediately punish individuals who do not abide by the agreement, are ideal for a conspiracy. However, the fact that a market structure includes few large entities, even oligopolistic corporations, and engages in conscious parallel pricing does not, without more, violate antitrust laws. <u>Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.</u>, 971 F.2d 37, 50 (7th Cir. 1992)(quoting <u>E.I. Du Pont de Nemours & Co. v. FTC</u>, 729 F.2d 128, 139 (2d Cir. 1984)). Defendants are arguing that, because they all felt

the same market forces before the Tax Sale, they were all prepared for a return to the time before Capital Assets first entered the Tax Sale. Therefore, defendants argue that they each merely followed the leader because it was more profitable to bid high and curtail the use of multiple bidders.

When a defendant puts forward denials of a conspiracy based on a defense of conscious parallelism, Courts have allowed plaintiffs to proceed by presenting evidence that there is some "plus factor" which reduces the probability of independent action. Market Force, 906 F.2d at 1172; Cayman Exploration Corp. v. United Gas Pipe Line, Co., 873 F.2d 1357, 1361 (10th Cir. 1989)(The fact that the action is against self-interest is a plus factor.); In re Plywood Antitrust Litigation, 655 F.2d 627 (5th Cir. 1981)(A high level of communication can constitute a plus factor.); In re Citric Acid Litigation, 191 F.3d at 1099-1100 (Trade associations and access to price lists are potential plus factors.); Mitchael v. Intracorp. Inc., 179 F.3d 847, 859 (10th Cir. 1999)(A simple exchange of information, like pricing, and is not a sufficient plus factor.). This manner of proving a conscious parallelism case arose in response to the fact that virtually all conspiracy cases are proven on the basis of circumstantial evidence. The Supreme Court has warned us to be careful not to punish unilateral independent conduct of competitors. Matsushita, 475 U.S. at 594. However, since the exact nature of "plus factors" has not been exhaustively articulated by any court, our analysis necessarily rests on the unique factual proof of this case.

In general, plaintiffs argue that these four factors show a great likelihood that a conspiracy existed: 1) the numerical differences between average winning bid numbers between 1995 and 1996; 2) the fact that many tax buyers reduced the number of multiple bidders before the auction is evidence that an agreement was reached in anticipation of the 1996 Tax Sale; 3) buyers began the bidding, on the first property, at 18% and, therefore, defendants could not have merely been

following the leader; and 4) the high number of runs of 18% bidding, up to 1125 properties in a row sold at 18%, was unprecedented in Cook County Tax Sale history.

We will analyze each defendant individually because, even in a conspiracy case, liability remains individual and is not a matter of mass application. Kotteakos v. United States, 328 U.S. 750, 772 (1946). However, plaintiffs' best argument is simply that the major players in the Tax Sale must have conspired for this sale to have unfolded in the way that it did. Therefore, plaintiffs are appealing to something else the Supreme Court stated in Kotteakos, namely, "when many conspire, they invite mass trial by their conduct." Id. at 773. By analyzing the individual evidence brought against each defendant, we will attempt to balance these concerns. We spend very little time analyzing the rates involved because we have determined that the penalty rates represent a very significant shift from the bidding in previous years. Insofar as rates alone can suggest a conspiracy, the bidding patterns involved in the instant case are unusual enough to give this court pause. Therefore, we analyze the evidence presented by the plaintiffs, defendant by defendant, in order to determine whether there is any other evidence which tends to exclude the possibility of independent action.

In this case, evidence of pre-Tax Sale decision-making, either decisions of whether to bring multiple bidders to the sale or whether to bid 18% on the first property, represent plaintiffs' strongest circumstantial arguments. Pre-Tax Sale decision-making tends to discredit defendants' argument that the decisions that resulted in the predominant 18% bidding occurred because each of the defendants exhibited independent business judgments. Circumstantial evidence which suggests that defendants had the opportunity to conspire is much weaker and, merely by itself, does not satisfy the

standard that plaintiffs must produce evidence which reasonably tends to undermine defendants' argument of independent action.

A)    <u>Capital Asset</u>

Capital Asset purchases taxes at auctions in many states. It first participated in Cook County at the 1992 Annual Tax Sale. Capital Asset bid in Illinois through its agents, Northern Illinois Securities, Inc. and S.I. Securities. Capital Asset's agreement with its agents stated that its confidential information and strategies could be shared with the Rochman Group, a group including Barrett Rochman, Charles W. Decker, Kenneth Rochman, John Bridge and any entity in which they individually or collectively own a 50% or greater interest.

John Bridge was the principal bidder for Capital Asset. He reported to Joe Whelihan and Whelihan provided Bridge with bidding parameters. The parameters included advice about the volume of purchases, the types of properties on which to submit bids and the interest rates at which to bid. The parties dispute the instructions that Whelihan provided before the 1992 tax sale. However, it is uncontroverted that Capital Asset brought multiple bidders to the sale from 1992 through 1995. Capital Asset pursued a strategy in which it attempted to reach a "critical mass" of properties by bidding low and bringing a large number of multiple bidders to the auction.

Capital Asset claims that it had a change of strategy between the 1995 and 1996 tax sales. Bridge testified that Whelihan initially instructed him to bid no lower than six percent because Capital Asset wanted to acquire fewer properties and at higher rates. Bridge also testified that he was instructed to start slowly in order to gauge the market. Bridge testified that he suggested that Capital Asset not use multiple bidders in the 1996 Tax Sale because he was afraid that the Cook County representatives did not approve of the use of multiple bidders. Capital Asset did not use

17

multiple bidders at all during the 1996 Tax Sale. Capital Asset purchased 3,019 properties and the mean winning bid rate for properties it acquired during the 1996 Tax Sale was 13.32%.

Plaintiffs reference a series of events which involved Capital Asset in a Michigan Tax Sale as circumstantial evidence that Capital Asset was involved in antitrust violations. On April 17, 1997, William Dahms sent a letter to a number of tax buyers. The parties dispute Dahms' relationship to Capital Asset. Plaintiffs contend that Dahms ran Capital Asset's buying operations in Michigan, but Capital Asset argues that Dams was an independent contractor. The letter was a summary and notice of an "agreement" regarding tax practices at Michigan Tax Sales. The letter stated that the parties agreed not to register more than five bidders in the six largest tax sales in Michigan and agreed to register less than five bidders at all other sales. In order to enforce the "agreement", Capital Asset, Equifunding, Swans and TransAm would each place an order for 30 temporary staff and flood the tax sale with multiple bidders if anyone violated the agreement. The letter also pledged a "consortium of cooperation" to "honor priors", yield to small local bidders, and "discourage bidding down."

One of the recipients of the letter, Cheryl Prosen of Q.T.S., was involved in this case. Upon receiving the letter, she thought that "this sounds like collusion and we're not part of that." She sent the letter to Q.T.S.'s counsel who wrote a response. He stated that "QTS will neither overtly nor covertly enter into any agreement which might in any way affect the bidding at Michigan tax sales or which will serve to limit its or other parties' participation therein. QTS was not and will not be a party to any such agreement."

In response, Dahms sent a second letter in which he acknowledged that he had been advised that the "agreement" might be illegal and withdrew the first letter. However, he noted that he and

18

other tax buyers "independently intend to limit the number of bidders at Michigan tax sales this year." He further stated that "Capital Asset does not intend to place more than 5 bidders at a given sale as long as we are convinced that no other party has more than 5 bidders representing related companies at any one sale."

Capital Assets contends that it made an independent business judgment to change its bidding strategy two months before the 1996 Tax Sale. Bridge testified that Whelihan advised him not to bid less than 6% on properties and to reduce the number of taxes purchased at the sale. Bridge also testified that he brought multiple bidders to the sale, but decided not to seat them unless other buyers used multiple bidders.

Plaintiffs make several arguments specifically directed at Capital Assets. First, they reference the meeting between Nadler, Ardell and Kaplan six days before the beginning of the Tax Sale. Capital Asset registered multiple bidders four days before the meeting. Plaintiffs argue that this meeting was one of the places where the conspiracy was discussed. Ardell and Kaplan both deny that the conspiracy was discussed at the meeting. However, the meeting qualifies as a plus factor. Furthermore, Capital Asset's rationale for the decision to decrease multiple bidders is weak. Bridge testified that he did not want to use multiple bidders because he felt that the Collector and auctioneer discriminated against companies who brought multiple bidders, but was unable to recall any specific instances of discrimination. The timing of the decision, in itself, is a "plus factor" sufficient to tend to exclude Capital Asset's explanation.

A second "plus factor" piece of evidence is the entry of S.I. Securities into the market. S.I. was the creation of Capital Asset's agent in Cook County. Barrett Rochman, an agent of Capital Asset, testified that he decided to begin bidding for himself in the 1996 Tax Sale because Capital

Asset was terminating its agency agreement. A reasonable factfinder could look at S.I.'s entry into the market and find evidence that tends to discredit individual decisions because the Tax Sale market was at its lowest point ever. Therefore, the new entry of S.I., a sophisticated player in the Tax Sale market who would have known about the likelihood of low penalty rates, is evidence which tends to exclude the possibility of independent action.

We have not reached the decision of whether the letter written by Dahms in 1997 to other bidders in Michigan is admissible because the general evidence of conspiracy along with the timing of Capital Asset's decision not to use multiple bidders is sufficient evidence for plaintiffs to survive summary judgment for this defendant and reach a factfinder. Therefore, we will determine, at a more appropriate juncture, whether this evidence is admissible.

B)     Oak Park Investments and C.B.B.B. Inc.

The evidence of Oak Park's involvement in the conspiracy is almost entirely interrelated to C.B.B.B. Inc. Therefore we will analyze plaintiffs' arguments against both corporations.

Oak Park and its predecessors have participated as a bidder in the Cook County Annual Tax Sale for most years since 1984. Timothy Balin is one of the principal shareholders in Oak Park. His father, Gilbert Balin, is an employee of Oak Park. Gilbert Balin's brother, Richard Balin, is the sole owner of defendant C.B.B.B. Incorporated. Other than the connection between the Balins, which the plaintiffs allege could represent a multiple bidder, Oak Park had never sent a multiple bidder to the Cook County Annual Tax Sale. Timothy Balin was the sole bidder representing Oak Park on the first day of the tax sale. He bid 18% on the first property sold in the 1996 Tax Sale.

In preparing for the 1996 Tax Sale, Timothy Balin was not optimistic about the rates. He testified that he expected that the average rates would be similar to those of the previous three years.

There was serious debate among the principals in Oak Park as to whether they were going to participate in the 1996 Tax Sale in light of the low bid rates in the previous years. Timothy Balin decided to bid on properties with small tax balances due.

Gilbert and Richard Balin divided up the responsibilities of inspecting and evaluating the properties that were contained in the bid book that they had ordered from the county. They considered various factors and, if the property was deemed worthy of a bid, marked "ok" on the bid book.

Timothy Balin testified that he always started bidding at 18% at the commencement of a Tax Sale. He further testified that he was surprised to see that the rates did not drop. Oak Park continued to bid 18% for properties and depended on "the auctioneer's practice of fairly distributing the tied 18% bids amongst the various bidders."

Richard Balin is the sole shareholder of C.B.B.B., Inc. Richard Balin had been a shareholder of Oak Park Investment, but had retired in 1993. Neither Richard Balin nor C.B.B.B. had participated in tax sales for the six years prior to the 1996 Annual Tax Sale. Richard Balin had never participated on his own in real estate tax buying.

Richard provided financing by obtaining a letter of credit in the amount of $100,000 from Bank Leumi, secured by a certificate of deposit. He further withdrew $200,000 to $300,000 from safety deposit boxes and obtained a loan of $550,000 from his brother. As a self described "conservative investor", Richard Balin kept most of his money in safe deposit boxes.

Richard Balin had previously scheduled vacations during the Tax Sale and could not attend substantial portions of the sale. Therefore, Tamara Balin Carter, Gilbert Balin's daughter, bid on

properties for Richard Balin. Tamara had never before attended a tax sale. While she bid for C.B.B.B., she remained on Oak Park's payroll.

As noted above, Richard and Gilbert divided the research before the sale. Both Oak Park and C.B.B.B. contend that the parties had no discussions or contact related to bid rates. However, Tamara testified that she discussed bid rates with her father and uncle before the Tax Sale. Richard instructed Tamara to bid no lower than 5 or 6% for the properties. When she reported to him that the bidding was at 18%, Richard obtained the additional loan of $550,000 from his brother. C.B.B.B. purchased a total of $1,180,566,77 in tax delinquencies at the 1996 Annual Tax Sale.

Gilbert Balin testified that other bidders, National specifically, were "picking on [Tamara]" and bidding down the penalty rates on properties on which Tamara made an initial bid. Smith testified that it appeared that National was bidding her down because National thought that Tamara was a multiple bidder for Oak Park.

The only piece of circumstantial evidence unrelated to the relationship between the two entities is that Timothy Balin, Oak Park's bidder, bid 18% on the first property. However, he testified that he always bid 18% at the beginning of an auction. This piece of circumstantial evidence, standing alone, is not sufficient to meet the standards outlined above.

The relationship between Oak Park and C.B.B.B. may be sufficient to deny summary judgment as to both of them. However, there is no evidence which ties either Oak Park or C.B.B.B. to any of the other defendants. There are not any plus factors which allow plaintiffs to claim that their evidence tends to disprove the arguments which these two defendants have put forward. Oak Park and C.B.B.B. did not meet with any of the other defendants, they did not change their multiple

bidding strategy before the Tax Sale, and Richard Balin's statements about the reasons he decided to enter the Tax Sale are uncontradicted.

However, plaintiffs argue that Oak Park and C.B.B.B. conspired between themselves, but do not show or allege the anti-competitive effect that could be the result of a conspiracy between these two relatively small entities. It is irrelevant to this Court whether Oak Park and C.B.B.B. discussed pricing strategies because, even if the two bidding corporations were to be fully synchronized, they could not have affected the overall market. Small entities can be liable for participation in a conspiracy if the conspiracy taken as a whole can affect prices and the overall market. Plaintiffs here have alleged such a broad conspiracy. However, there is no direct or circumstantial evidence linking Oak Park or C.B.B.B. to the broader conspiracy. Therefore, the actions of Oak Park and C.B.B.B. could not have let to a resultant unreasonable restraint of trade or injury. <u>Denny's</u>, 8 F.3d at 1220. We enter summary judgment in favor of defendants Oak Park Investments, Incorporated and C.B.B.B. Incorporated because no evidence ties their behavior to the larger conspiracy and even if they conspired with each other, the conspiracy is not actionable.

   C) <u>D.S. Tax</u>

D.S. Tax has participated solely in the Cook County Tax Sale for the last ten years. Dewey Suster is the president and sole shareholder of D.S. Tax. In the 1992 and 1993 Tax Sales, D.S. filed its registration prior to the tax sale's commencement and attended the tax sale on the first day it began. Its participation was not profitable and Suster reduced D.S.'s participation focusing its resources on what Suster perceived to be more profitable business opportunities.

However, D.S. had gained profits from buying taxes in certain geographic areas, such as Thornton and Proviso Townships. Therefore, Suster determined that he would concentrate his

resources and buying in those areas in which D.S. had historically shown a profit. Each year from 1994 through 1996, D.S. applied for reduced amounts of letters of credit in preparation for the Tax Sales. Before the Tax Sale began, D.S. determined that it would purchase the same or fewer properties as it had in 1995. D.S. utilized two individuals to bid on taxes at the 1996 Tax Sale.

The 1996 Annual Tax Sale began on January 12, 1998. D.S. registered for the Tax Sale on January 16, 1998, and first won a property on January 26, 1998. According to statute, D.S. could not begin bidding on properties for ten days after registering. D.S. only registered one bidder for the 1996 Tax Sale.

D.S. did not bid on January 27, 1998, because the properties were in areas that D.S. determined were less profitable. However, it learned that the prevailing penalty bidding rates were simultaneous bids of 18%. D.S. bid at the prevailing rates, except when it had particular need for the property being auctioned.

D.S. was a member of an entity organized to lobby on behalf of buyers named the Taxpayers Action Committee ("TAC"). TAC was organized in 1973 as a not-for-profit corporation for the purpose of lobbying. Suster was asked to serve as treasurer and secretary. His duties consisted of managing the checking account, paying the bills and collecting dues. In February of 1996, Suster concluded that the expenses associated with participating outweighed the benefits. However, the parties dispute exactly when D.S. actually quit TAC. D.S. alleges that it left after 1996, but plaintiffs allege that Suster continued to keep records at least through the 1996 Annual Tax Sale in 1998.

Plaintiffs reference a Regent Properties telephone message paid which contained a message from Farmer, a D.S. employee. Farmer testified that the exchange was brief and limited to a single

property. Suster testified that D.S. had not bought or sold Tax Certificates from any tax bidder at the 1996 Sale.

D.S. Tax joined the 1996 Tax Sale late. It registered on January 16, 1998. Before the sale, D.S. had reduced the amount of the letter credit it obtained compared to the year before. One day after joining the Tax Sale, on January 27, 1998, D.S. did not bid on any properties, even though the taxes were selling for an 18% penalty rate, because it had previously determined that those properties were less profitable. After the forfeiture rule was instituted, D.S. continued to bid on properties that met its specifications. The only piece of evidence which plaintiffs reference that could possibly be characterized as a plus factor is D.S.'s participation in the Taxpayer's Action Committee. This factor, in absence of any other "plus factor" is not sufficient to tend to disprove D.S.'s claim of independent action.

D.S. is a clear example of a tax buyer following the leader. It entered the Tax Sale at a point in which bidding 18% was already an ingrained course of behavior. It followed the market. There is no evidence that D.S. was involved in any conspiracy activity in anticipation of the Tax Sale. The fact that D.S. had lowered the amount of its letter of credit together with the fact that D.S. entered the sale late proves that no reasonable jury could find that D.S. participated in a conspiracy in violation of the Sherman Antitrust Act. Therefore, we grant D.S.'s motion for summary judgment and enter judgment in favor of D.S. Tax.

D) <u>First Financial</u>

Marshall Atlas and Richard Durra are the sole shareholders of First Financial. Atlas is the president. In order to prepare for the Tax Sale, First Financial rented the tapes, produced by Cook County, of tax liens to be auctioned. It hired Bill Dwyer, a computer programmer, to produce a

25

program which reflected the name, index number, volume, assessed violation, total tax due, and the amount of the tax for each property. The information was divided into about 30 books, divided by township, and Atlas studied the information. Atlas highlighted every index number that he wanted to bid on at the sale.

Atlas determined the tax rate to bid by considering the type of property, the location of the property, the appearance of the property, whether the owner had paid half of a tax installment, whether it was occupied, whether it was generating income, whether it was mortgaged, the quality of the neighborhood, the presence of environmental problems, the presence of housing violations, the insurability of the property, impairments on title, and the prevailing bid rate. Atlas would also consider First Financial's cost of money, inventory of properties, lines of credit, recent profits and loss experience, and the number of properties it had purchased at that Tax Sale. Atlas would, in person, inspect properties with liens larger that Ten Thousand Dollars ($10,000).

Atlas was one of few bidders who bid on properties for which only a small balance was due. However, he virtually never bid on marginal properties, special assessments, gas stations, or land, unless he had the opportunity to investigate further. He also testified that, prior to the 1996 Tax Sale, he decided that First Financial would not bid on items under $100,000 if the bidding was at zero percent.

First Financial only used two individuals to bid on properties in the 1996 Annual Tax Sale, Atlas and Ron Ohr. Atlas testified that he did not share any information with other tax buyers who were planning to attend the 1996 Tax Sale. He also testified that he had no expectation that the market would be any different from the previous year. Atlas testified that he began to bid 18% on most properties because the prevailing rates were around 18%. First Financial bought a majority of

its properties at 18%, but it also bought other properties between 1% and 18%. First Financial made purchases totaling $3,500,220.87 at the 1996 Tax Sale.

First Financial is a member of a lobbying organization called the Downstate Tax Buyers Group. Meetings occurred twice a year and Atlas attended unless there was a conflict with a tax auction in Cook County.

The circumstantial evidence specific to First Financial is that they bid 18% on the first property, participated in the Downstate Tax Buyers Association, and that Atlas and Durra, the two principals, socially interacted with other tax buyers. The fact that First Financial engaged in social informal communication and joined a lobbying group is merely some evidence that they had the opportunity to conspire, it is not a plus factor. Market Force, Inc., 906 F.2d at 1172.

The first bid at 18% is more significant. It suggests that First Financial made a pre-Tax Sale decision to bid at 18%. First Financial cannot argue that it was merely following the leader because it was a leader. The problem with relying only on this piece of evidence is that neither side presented any evidence detailing the first bid in previous Tax Sales. Therefore, we cannot know with certainty whether an initial bid at 18% is a departure from normal procedure.

Given the strength of the statistical evidence and the fact that First Financial was an initial bidder, we find that plaintiffs have presented sufficient evidence which tends to discredit the idea that First Financial was independently operating on its own business decisions. Therefore, we deny First Financial's motion for summary judgment.

E) <u>Midwest and David and Bonnie Gray</u>

David Gray is the president of Midwest. Midwest began bringing multiple bidders at the 1994 Annual Tax Sale and also brought multiple bidders to the 1995 Annual Tax Sale. Several

27

months before the start of the 1996 Tax Sale, Gray approached LaSalle Bank with a request to increase Midwest's funding from $12 million to $16 million.

David Gray testified that he prepared to have multiple bidders available for the 1996 Annual Tax Sale, but decided that he would use them only if other tax buyers also used multiple bidders. Gray testified that he believed that tax buyers who had been using multiple bidders for the last three years would be unable or unwilling to continue using more than one bidder. He testified, based on his almost forty years of experience, that a multiple bidder strategy could only be continued for a period of three to four years.

Gray testified that he had his multiple bidders obtain seat assignments on the first morning of the Tax Sale, but sent them into another room. When the Tax Sale began and he only saw 15-20 bidders, he instructed his primary bidder to start the bidding at 18%, take it slow and see what developed. Midwest won the 11th property at 3% and successfully won 25 properties at rates below 18% on the first day of the Tax Sale. Gray testified that Midwest was not engaged in any agreement or conspiracy to fix the bidding of the 1996 Tax Sale. Gray further testified that he probably would have been willing to buy all of the properties offered at 15% and was prepared to bid down to 0% on some of the properties.

Midwest made a pre-Tax Sale decision to only use multiple bidders if other tax buyers brought multiple bidders to the Tax Sale. As noted above, this is plaintiffs' strongest argument. Midwest argues that they "lined up" multiple bidders so that they would be available and obtained multiple seating assignments for those bidders. Therefore, plaintiffs' argument is not as strong as it would be had Midwest not actually brought the multiple bidders to the Tax Sale, but plaintiffs

argue that Midwest, and other tax buyers, only brought multiple bidders in order to threaten retaliation in case a tax buyer defected from the conspiracy.

David Gray testified that he made the decision regarding multiple bidders before the commencement of the sale. He testified that, in his business judgment, tax buyers could not maintain a multiple bidder strategy for more than three or four years in a row. Gray also testified that he sent his multiple bidders out of the auction room before the beginning of the Tax Sale. Finally, Midwest has admitted that its bidder participated in an effort to bid down properties upon which Noble, National's multiple bidder, submitted bids. Midwest claims that punishing a multiple bidder is a legal, competitive response to National using a multiple bidder. That is correct, but Midwest seems to be arguing that a classic prisoner's dilemma scenario was created at the 1996 Tax Sale after years of accelerating defections. Plaintiffs' position, with which we agree, is that the speed by which all the bidders changed from a highly competitive posture to a highly cooperative posture is difficult to reconcile with the idea of independent conduct. The fact that Midwest made the decision not to use multiple bidders before the beginning of the Tax Sale tends to disprove that it acted independently. Therefore, we deny Midwest's motion for summary judgment.

F)     National Indemnity and Noble Tax

National was created, by Jennings Realty, to purchase delinquent real estate taxes in 1970. National only buys taxes in Illinois. National states that it bids based on the dynamics of the tax sale, the judgment of its principals, the results of a search of the Tax Sale history of the property, field inspections, the location of the property, and its physical condition.

National began using multiple bidders in the 1992 Annual Tax Sale, which took place in 1994. National brought three extra bidders to the 1992 Tax Sale and, at later sales, increased the

number to five and then ten multiple bidders. National gave its multiple bidders a list of properties on which they were instructed to bid zero. National only used multiple bidders to raise volume on residential and small balance commercial properties.

Howard Berland testified that National was unhappy with the result of bidding zero percent because of the low rates of return. Berland testified that he and Warren Peters decided not to use multiple bidders at the 1996 Tax Sale, but wanted to have some ready for use. Therefore, National decided, before the commencement of the Tax Sale, to use only a single bidder, Mary Cruz. However, National registered 21 bidders for the 1996 Tax Sale. Berland further testified that National assumed that other tax buyers were experiencing the same problems and would refrain from using multiple tax bidders at the 1996 Annual Tax Sale.

In prior years, Berland had instructed his bidder, Cruz, to attempt to get a high volume of properties. However, before the 1996 Tax Sale he informed Cruz that she should attempt to get high rates. She understood his instruction sheet to mean that she should not bid lower than four percent. Cruz bid 18% from the beginning because she wanted a high rate sale.

On February 23, 1998, National sent in a multiple bidder, Scott Mondi, to bid under the name Noble Tax Investors. Mondi only bid between February 23 through February 26 because he was unable to get high rates. Other bidders would bid down the penalty rate if Mondi was bidding on a property.

National made a pre-Tax Sale decision not to use multiple bidders. It registered 21 bidders for the 1996 Tax Sale, but only brought one multiple bidder to the first day of the sale. Berland testified that he and Peters decided not to use multiple bidders because that strategy had resulted in low rates of return. As we have previously noted, a pre-Tax Sale decision to reduce the number of

bidders is plaintiffs' strongest piece of circumstantial evidence. Standing alone it is sufficient to tend to disprove the fact that defendants acted individually.

In addition, Cruz, National's sole bidder, began bidding exclusively at 18%. Therefore, National cannot claim to merely have followed the leader. National was one of the buyers responsible for initiating the trend. Taken together, the reduction of multiple bidders and the initial and continued bids at 18% are sufficient for plaintiffs to withstand summary judgment with respect to National.

National makes the argument that its use of Mondi as a multiple bidder, under the name Noble Tax, on February 23, 1998, proves that it was not involved in the conspiracy. Other bidders bid down the penalty rate on all properties which Mondi attempted to bid, and therefore, Mondi only bid through February 26. As we noted at the hearing on February 8, 2001, these events are just as consistent with the idea that National was attempting to gain an upper hand and maximize its own profit even after entering into a conspiracy. The fact that the repercussion was so swift tends to show that a system was in place to immediately punish defectors from the conspiracy.

        G)    <u>Phoenix Bond</u>

Phoenix Bond began preparing for the 1996 Tax Sale by obtaining the computer tape itemizing the properties for sale. It hired an independent computer consultant to produce appraisal sheets for certain properties selected by Phoenix Bond. Phoenix inspected some of the properties and did abbreviated title work. In most instances Phoenix did not set a minimum bidding rate.

At the 1996 Tax Sale, Andrew Marks was Phoenix Bond's principal bidder. The parties dispute whether Phoenix Bond had ever hired multiple bidders. Phoenix alleges that it had used multiple bidders in the past, but failed to cite to any testimony establishing that it had hired anyone

other than Marks and Mira Kovacevic to bid. Phoenix alleges, also without reference to testimony, that it brought multiple bidders to the 1996 Tax sale. After Marks saw National Indemnity, another bidder, arrive with only one tax buyer, Marks testified that he decided to forego the option of using multiple bidders.

At the beginning of the Tax Sale, Marks refrained from bidding, at least for the first five properties sold, to get a sense of the market. Phoenix Bond then purchased its first property at 18%. Shortly thereafter, Marks and Prosen, of Q.T.S., had the discussion in which Marks threatened to bring multiple bidders to the sale in response to Prosen's use of multiple bidders.

Phoenix Bond purchased 1,501 items at the 1996 Annual Tax Sale. The principals testified that they never met with, wrote to, or spoke with any other tax buyers regarding rates or participate in any agreement concerning the 1996 Annual Tax Sale.

Phoenix Bond claims that it arrived at the Tax sale with the same number of multiple bidders as it had brought the year before, but failed to cite to any testimony establishing that it brought anyone other than Andrew Marks and Mira Kovacevic. Andrew Marks, Phoenix's lead bidder, testified that he noticed that National had not brought multiple bidders to the Tax Sale and decided not to use multiple bidders. Marks also testified that he did not bid on the first few items offered at the Tax Sale, but Ohr testified that Phoenix was among the bidders who bid 18% at the beginning of the Tax Sale. Whether Phoenix bid 18% to start the sale is a disputed material fact precluding summary judgment.

The strongest piece of circumstantial evidence which plaintiffs have brought against Phoenix involves Marks' statement to Prosen of Q.T.S. Q.T.S. brought and used multiple bidders at the 1996 Tax Sale. After one of the multiple bidders won a property, Marks turned to Prosen and said "[w]ell,

we can bring as many bidders as we want to a sale, too, and if you keep them here, we will."

Phoenix argues that Marks, using the ambiguous pronoun "we", was referring to Phoenix, a family owned business. We agree that the term "we" in context is ambiguous and, standing alone, does not tend to disprove defendant's position that it acted independently. However, coupled with the dispute as to whether Phoenix initially bid 18% and the disputes about the number of multiple bidders and the way that they were dismissed, a reasonable jury could find for plaintiffs if it drew all reasonable and justifiable inferences in plaintiffs' favor. Therefore, we deny Phoenix Bond's motion for summary judgment.

<blockquote>H)    <u>Regent</u></blockquote>

Regent began operations in 1982 and participated in the 1980 Annual Tax Sale held in 1982. Regent has never purchased delinquent property taxes in tax sales outside of the Chicago metropolitan area. The three principals of Regent are Milford Ardell, Allen Kaplan and Fred Shandling. Regent employs Steve Deely to assist in preparation for the Tax Sales. Deely extensively evaluates the properties offered for sale to determine on which properties Regent should bid. Since 1988, Deely has been Regent's principal bidder.

Kaplan testified that he and his partners noticed that other businesses, which the principals were involved in, were proving to be more profitable and less administratively burdensome. Therefore, in preparation for the 1996 Tax Sale, Kaplan and Ardell allege that they decided to reduce Regent's level of participation in the Tax Sale. Regent registered fewer multiple bidders for the 1996 Tax Sale then it had for the 1994 and 1995 Annual Tax Sales. At the 1995 Tax Sale, Regent sent seven bidders, but Regent only sent three bidders to the 1996 Tax Sale.

Kaplan, Ardell and Deely all testified that they believed that the previous four years of near zero percent penalty rate bidding may have adversely affected their competitors. Kaplan and Ardell told Deely that they did not want Regent to have a high level of participation in the 1996 Tax Sale if the rates continued to be low.

Deely arrived, on the first day of the 1996 Tax Sale, with two multiple bidders. However, he instructed them not to bid unless they received further instructions from him. The parties dispute whether Deely bid on the first item offered at the Tax Sale. Deely testified that he noticed that others were bidding at 18% and that other companies did not bring multiple bidders to the sale. Deely testified that he began bidding at 18% because he felt that 18% was the prevailing rate and that he did not use multiple bidders because other tax buyers were not using them. Deely, Kaplan, Ardell and Shandling all denied that they had agreed with any other buyer to fix the bidding rates at the 1996 Tax Sale.

Plaintiffs have come forward with three pieces of circumstantial evidence. Regent, prior to the sale, registered fewer multiple bidders for the 1996 Tax Sale than the 1995 Tax Sale. Regent sent three bidders to the 1996 Tax Sale, but determined that only Steve Deely would bid, unless other buyers were using multiple bidders. The parties dispute whether Regent bid 18% on the first property. Finally, Kaplan and Ardell, the two Regent principals, met, for lunch, with a representative of Capital Asset six days before the commencement of the sale. Taken together, this evidence of pre-Tax Sale conduct is sufficient to tend to disprove that Regent pursued a follow the leader strategy independent of involvement in a conspiracy. Therefore, we deny Regent's motion for summary judgment.

II.         Plaintiffs' Unrelated Allegations

Plaintiffs make several arguments in favor of their motion for summary judgment which have no real connection to whether the defendants engaged in a conspiracy to fix the penalty rates at the 1996 Tax Sale. Plaintiffs make allegations of individual instances of false and pretextual discovery responses, the credibility of individual witness testimony based on allegations of prior convictions, and several allegations concerning the alleged destruction of evidence. At best, these allegations involve the amount of weight we are to grant to evidence. Weighing evidence is the province of the jury and we will not entertain arguments regarding the weight of evidence while analyzing a motion for summary judgment.

## CONCLUSION

After an extensive analysis of the depositions, briefs and oral argument transcript, we grant in part and deny in part defendants' motions for summary judgment. We grant the individual motions for summary judgment brought by D.S. Tax Associates, Ltd. [209-1], Oak Park Investments, Inc. [229-1] and C.B.B.B., Inc. [228-1] and enter judgment in favor of D.S. Tax, Oak Park Investments and C.B.B.B. We deny all other motions for summary judgment including the motions brought by: certain defendants jointly [242-1]; Capital Asset, S.I. Securities and Barrett Rochman [231-1]; First Financial Funding Co. [235-1]; Midwest Real Estate Investment Co., David Gray and Bonnie Gray [238-1]; National Indemnity Corp. and Noble Tax Investors, Inc. [224-1], Phoenix Bond & Indemnity Co. [226-1]; and Regent Properties, Milford Ardell, Allen Kaplan and Fred Shandling [233-1].

Wayne R. Andersen
United States District Judge

Dated: July 3, 2001